**FILED**
CLERK, U.S. DISTRICT COURT

9/28/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____jb_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:20-cr-00432-SVW |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 371: Conspiracy to Solicit and Receive Illegal Remunerations for Health Care Referrals; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| HOWARD JAY BARTZ, JR., | |
| Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 371]

A.    INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

1.    Defendant HOWARD JAY BARTZ, JR. owned and operated a company called Meditech LLC ("Meditech"), which was headquartered in Baltimore, Maryland, and did business throughout the United States, including in the Central District of California.  Beginning in or around October 2015, and continuing to in or around November 2018, defendant BARTZ was a resident of Newport Beach, California, within the Central District of California.

2.    Consulting Company 1 was a company that was formed in or about February 2011.  Consulting Company 1 engaged marketers to generate prescriptions of compounded drugs and other pharmaceuticals for Pharmacy 1, located in Beverly Hills, California; Pharmacy 2, located in Henderson, Nevada; and Pharmacy 3, located in Los Angeles, California (collectively, "the Pharmacies").  Co-conspirator 1 ("CC-1"), Co-conspirator 2 ("CC-2"), Co-conspirator 3 ("CC-3"), and Co-conspirator 4 ("CC-4"), owned and operated the Pharmacies from within the Central District of California.

TRICARE

3.    TRICARE provided health care coverage for Department of Defense beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

4.    Individuals who received health care benefits through TRICARE were referred to as TRICARE beneficiaries.  The Defense Health Agency, an agency of the Department of Defense, was the military entity responsible for overseeing and administering the TRICARE program.

5.    TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed physician.  Express Scripts, Inc. administered TRICARE's prescription drug benefits.

6.    TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies.  If a beneficiary chose a network pharmacy, the pharmacy would collect any applicable coinsurance or copayment from the beneficiary, dispense the drug to

the beneficiary, and submit a claim for reimbursement to Express Scripts, Inc., which would in turn adjudicate the claim and reimburse the pharmacy.  To become a TRICARE network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

MEDICARE

7.    Medicare provided benefits to individuals who were 65 years and older or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services.

8.    Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Each beneficiary was given a unique health insurance claim number.  Health care providers who provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

9.    To participate in Medicare, a provider was required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations, including the Anti-Kickback Statute prohibiting the payment of kickbacks for patient referrals. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for processing and payment of claims.

10.    A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services and products provided to Medicare beneficiaries.

11.    Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the

providers agreed that they: (a) were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) would submit claims that were accurate, complete, and truthful.

12.   Medicare Part D provided coverage for outpatient prescription drugs.  Medicare beneficiaries were able to obtain Part D coverage through: (1) enrollment in one of many prescription drug plans, which covered only prescription drugs and were offered by qualified private insurance plans (often referred to as drug plan "sponsors"), which received reimbursement from Medicare; or (2) a Medicare Advantage plan that covered both prescription drugs and medical services.  A beneficiary was responsible for any deductible or co-payment required under his or her prescription drug plan.

13.   Medicare reimbursed providers for certain compounded drugs that were medically necessary to the treatment of a beneficiary's illness or injury, were prescribed by a beneficiary's physician or a qualified physician's assistant acting under the supervision of a physician, and were provided in accordance with Medicare regulations and guidelines that governed whether a particular service or product would be reimbursed by Medicare.

14.   A pharmacy provider was required to provide certain information when filing claims with Medicare.  This information included: identification of the person or entity that provided the medication, identification of the medication that was provided, identification of the prescribing physician, identification of the beneficiary, and the date the prescription was dispensed.

DOL-OWCP

15.   The Federal Employees' Compensation Act, Title 5, United States Code, Sections 8101, et seq. ("FECA") provided certain benefits to civilian employees of the United States, for wage-loss disability due to a traumatic injury or occupational disease sustained while working as a federal employee (the "FECA program").

16.   The Office of Workers' Compensation Programs ("OWCP"), a component of the Department of Labor, administered the FECA program, which was a federal workers' compensation program focused on return to work efforts and was not a medical insurance or a retirement plan.

17.   When a qualified employee suffered a work-related injury, the employee filed a claim for coverage with OWCP, which then assigned the claimant an OWCP claim number.

18.   To obtain reimbursement for prescription drugs provided to OWCP claimants or beneficiaries, a pharmacy had to submit its prescription claims for payment to OWCP, using the beneficiary's OWCP claim number.  By submitting a claim for reimbursement with OWCP, the pharmacy provider certified that the service or product for which reimbursement was sought was medically necessary, appropriate, and properly billed in accordance with accepted industry standards.

19.   OWCP would process the claims submitted by the provider, and if all required information was included, OWCP would reimburse the provider in accordance with an established fee schedule.

CHAMP-VA

20.   The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMP-VA") provided health coverage for a veteran's spouse, children, or surviving-spouse.  Individuals who received health care benefits through CHAMP-VA were referred to as

CHAMP-VA beneficiaries.  The Veterans Health Administration, a component of the Department of Veterans Affairs, was the federal government entity responsible for overseeing and administering the CHAMP-VA program.

21.  CHAMP-VA provided coverage for certain prescription drugs, including certain compounded drugs, which were medically necessary and prescribed by a licensed physician, nurse practitioner, or physician's assistant.  OptumRX administered CHAMP-VA's prescription drug benefits.

22.  CHAMP-VA beneficiaries could fill their prescriptions through network or non-network pharmacies.  If a beneficiary chose a network pharmacy, the pharmacy would collect any applicable deductible or cost-share from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to OptumRX, which would, in turn, adjudicate the claim and reimburse the pharmacy.  To become a CHAMP-VA network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

FEDERAL HEALTH CARE PROGRAMS

23.  TRICARE, Medicare, the FECA program, and CHAMP-VA (collectively, the "Federal Health Care Programs") were "federal health care programs," as defined by 42 U.S.C. § 1320a-7b(f).  The Federal Health Care Programs would not pay for claims submitted by a pharmacy for prescriptions for compounded drugs that they knew, among other things, were procured through kickback payments in violation of state or federal law.

COMPOUNDED DRUGS

24.  In general, "compounding" was a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combined, mixed, or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient.  Compounded drugs were not FDA-approved, that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.  The California State Board of Pharmacy regulated the practice of compounding in the State of California.

25.  Compounded drugs were prescribed by a physician when an FDA-approved drug did not meet the health needs of a particular patient.  For example, if a patient was allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded drug would be prepared excluding the substance that triggered the allergic reaction.  Compounded drugs would also be prescribed when a patient could not consume a medication by traditional means, such as an elderly patient or a child who could not swallow an FDA-approved pill and needed the drug in a liquid form that was not otherwise available.

B.  OBJECT OF THE CONSPIRACY

26.  Beginning on an unknown date, but no later than in or about October 2012, and continuing through at least in or about July 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant BARTZ conspired with CC-1, CC-2, CC-3, CC-4, and others known and unknown to the United States Attorney to knowingly and willfully solicit and receive remuneration in return for

referring an individual to a person for the furnishing and arranging
for the furnishing of any item or service for which payment may be
made in whole or in part under a Federal health care program, in
violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

C. THE MANNER AND MEANS OF THE CONSPIRACY

27. The object of the conspiracy was carried out, and to be
carried out, in substance, as follows:

a. CC-1, CC-2, CC-3, and CC-4, through the Pharmacies,
would enter into agreements with marketers like defendant BARTZ to
pay illegal kickbacks and bribes to defendant BARTZ to generate and
steer signed prescriptions for compounded medications to the
Pharmacies.

b. Defendant BARTZ would obtain prescriptions and
supporting documentation for compounded drugs from doctors and cause
the prescriptions and supporting documentation to be transmitted to
the Pharmacies.

c. The Pharmacies would send compounded drugs by mail to
patient-beneficiaries and submit claims for reimbursement to the
Federal Health Care Programs.

d. In exchange for the referral of prescriptions to the
Pharmacies, defendant BARTZ would receive kickbacks, through
Meditech, from CC-1, CC-2, CC-3, and CC-4, amounting to approximately
28% of the amount that the Federal Health Care Programs paid on the
compounded drug prescriptions that defendant BARTZ referred to the
Pharmacies. Defendant BARTZ would also arrange for Marketer A to
make referrals to the Pharmacies, and defendant BARTZ would receive
approximately 5% of the amount that the Federal Health Care Programs

Case 2:20-cr-00432-RGK   Document 1   Filed 09/28/20   Page 9 of 12   Page ID #:9


paid for compounded drug prescriptions that Marketer A referred to the Pharmacies.

        e.   In order to disguise the kickbacks and conceal their scheme, defendant BARTZ, along with CC-1, CC-2, CC-3, and CC-4, would enter into contractual agreements that falsely made it appear as though defendant BARTZ would not receive kickbacks for the referral of prescriptions that were paid for by the Federal Health Care Programs.  Specifically, the contracts that defendant BARTZ entered into with the Pharmacies provided that defendant BARTZ would not receive compensation for prescriptions that were paid for by Federal Health Care Programs, even though, as defendant BARTZ knew, defendant BARTZ was receiving compensation from the Pharmacies for referring those prescriptions.

28.   Based on the compounded drug prescriptions that defendant BARTZ and Marketer A referred to the Pharmacies, in exchange for illegal kickbacks, the Pharmacies were paid a total amount of approximately $8,355,317 from the Federal Health Care Programs. Defendant BARTZ received illegal kickback payments based on those referrals of approximately $2,099,706.

D.   <u>OVERT ACTS</u>

29.   On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant BARTZ, together with CC-1, CC-2, CC-3, CC-4, and others known and unknown to the United States Attorney, committed, and willfully caused others to commit, the following overt acts, among others, within the Central District of California, and elsewhere:

<u>Overt Act No. 1:</u>   On or about January 1, 2015, defendant BARTZ, on behalf of his company Meditech, executed a Marketing

9

Agreement with Consulting Company 1, under which agreement Consulting Company 1 would pay Meditech a percentage of the amount that the Pharmacies received in payment from the prescriptions that defendant BARTZ referred to the Pharmacies.

<u>Overt Act No. 2:</u>    On or about June 1, 2016, defendant BARTZ, on behalf of his company Meditech, executed a Consulting Services Agreement with Pharmacy 2, under which agreement Pharmacy 2 would pay Meditech a flat monthly payment, which was calculated based upon how much defendant BARTZ would have received if Pharmacy 2 paid defendant BARTZ based on the percentage of the payments the Pharmacy 2 received from the prescriptions that defendant BARTZ referred to Pharmacy 2.

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c)

and 18 U.S.C. § 982(a)(7)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant HOWARD JAY BARTZ ("defendant") that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(7), in the event of defendant's conviction under the sole count of this Information.

2.    Defendant shall forfeit to the United States the following property:

a.    all right, title and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds obtained as a result of the commission of any offense set forth in the sole count of this Information; and

b.    a sum of money equal to the total value of the property described in subparagraph a. above.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c), defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the

1  jurisdiction of the court; (d) has been substantially diminished in

2  value; or (e) has been commingled with other property that cannot be

3  divided without difficulty.

4

5                                    NICOLA T. HANNA
                                     United States Attorney
6

7                                    _Scott M. Garringer_
                                     Deputy Chief, Criminal Division For:
8                                    BRANDON D. FOX
                                     Assistant United States Attorney
9                                    Chief, Criminal Division

10                                   RANEE A. KATZENSTEIN
                                     Assistant United States Attorney
11                                   Chief, Major Frauds Section

12                                   KRISTEN A. WILLIAMS
                                     Assistant United States Attorney
13                                   Deputy Chief, Major Frauds Section

14                                   ALEXANDER F. PORTER
                                     Assistant United States Attorney
15                                   Major Frauds Section

16

17

18

19

20

21

22

23

24

25

26

27

28